# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOHN VONDRAK,

        Plaintiff,

vs.                                No. CIV 05-0172 JB/LAM

CITY OF LAS CRUCES, POLICE OFFICER,
CINDY McCANTS and NATHAN KRAUSE
Individuals and employees of the Las Cruces Police
Department, and CITY OF LAS CRUCES,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiff's Combined Motion in Limine and

Daubert Motion to Exclude the Report and the Testimony of Tim Tipton, filed July 20, 2009 (Doc.

186).  The primary issues are: (i) whether the Court should exclude the testimony of Officer Tim

Tipton because Tipton is not qualified to offer the testimony; and (ii) whether the Court should

exclude Tipton's testimony and the report upon which that testimony is based because Tipton's

methodology does not pass scrutiny under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S.

579 (1993).  Because Tipton's experience, education, and training in the area of use-of-force in law-

enforcement settings are adequate and germane to the subject of his opinion testimony, the Court

will not exclude the testimony on account of his qualifications.  The Court also finds that Tipton's

methodology is sufficiently reliable under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, and that

much of his testimony and his report should come into evidence.  Nevertheless, the Court will

exclude any opinion testimony or information in Tipton's report regarding whether there was

reasonable suspicion to conduct field-sobriety tests and probable cause to take Plaintiff John

Vondrak into custody, because those issues have been decided as a matter of law and are no longer live in the case, and because the Defendants have agreed that the Court should exclude the testimony on those issues. The Court will also exclude Tipton's opinion regarding whether the handcuffs were double locked because Tipton does not present a sound methodology for reaching this conclusion. Finally, the Court will not permit Tipton to frame his opinions in terms of the "reasonableness" of McCants' actions because such a conclusion requires the application of facts to a legal standard, which is beyond the province of an expert witness.

## FACTUAL BACKGROUND

The facts leading up to this lawsuit are largely set forth elsewhere. See Vondrak v. City of Las Cruces, 535 F.3d 1198, 1200-03 (10th Cir. 2008); Memorandum Opinion and Order at 2-7, filed May 14, 2007 (Doc. 80)("MOO"). Briefly, Vondrak has sued for civil-rights violations arising from his arrest for driving under the influence. The Defendants plan to use Tipton as their expert. Tipton's education includes an A.S. in Political Science and "Advanced Law Enforcement Certification." Expert Witness Report at 10, filed August 6, 2009 (Doc. 199-3). Since 1998, he has taught as an adjunct professor at Oklahoma State University, Oklahoma City. He is currently a lieutenant with the Oklahoma Highway Patrol with nineteen years of experience in the design, development, and implementation of law-enforcement use-of-force programs. See id. He has experience as a classroom instructor as well as in the capacity of a scenario-based instructor, and courses he has developed are currently in use in various state, federal, and foreign law enforcement agencies. See id.

As a trooper, Tipton's professional experience also includes time spent as "Lead Firearms and Defensive Tactics Instructor," where his duties involved developing lesson plans and student manuals for use-of-force tactics. Id. He also developed department policies concerning use-of-

force.  <u>See</u> <u>id.</u>  Tipton additionally has experience as a "Firearms and Defensive Tactics Instructor" and as a "Department of Homeland Security certified instruction."  <u>Id.</u> at 10-11.  Finally, he is certified as a "Police Use of Force Expert."  <u>Id.</u>

In his report, Tipton summarizes the main points about which he will testify, opining that: (i) on the evening of the arrest, Defendant Officer Cindy McCants had reasonable suspicion that Vondrak was operating a car under the influence of an intoxicant; (ii) McCants established probable cause to take Vondrak into custody based on what she observed during the field-sobriety tests; (iii) McCants used a reasonable amount of force while applying handcuffs to Vondrak; (iv) McCants double locked the handcuffs in accordance with nationally accepted police training; (v) McCants closed the handcuffs with the proper tension, based on the evidence provided; and (vi) McCants followed nationally accepted police procedures during the transportation, testing, processing, and release of Vondrak.  <u>See</u> <u>id.</u> at 7.

> Tipton bases his opinion that the handcuffs were double-locked on the fact that
>
> it is a nationally recognized police procedure that the restraints are double locked. The double-locking of handcuffs is utilized for two reasons.  First, it makes it much more difficult for the handcuffs to be "picked" or unwanted removal by the arrestee. Second the double lock prevents the handcuffs from closing tighter on the subject's wrist.  The double lock secures the single strand bar inside the double strand.  This double locking of the handcuffs is critical to ensure that the subject being cuffed does not suffer injury from the continued closing of the restraint.
>
> It is my opinion that Officer McCants utilized the nationally recognized police procedure of placing Vondrak into the proper misdemeanor handcuffing position. It is my opinion that Officer McCants properly double locked the handcuffs once they were placed on Vondrak's wrist.  I find no evidence that would dispute the double locking.

<u>Id.</u> at 5.

To determine whether McCants placed the handcuffs too tightly on Vondrak's wrists, Tipton listened to audio analysis that Pro Audio Productions conducted of the recording from Officer

McCants' recorder.  See id.  Based on the recording, Tipton agrees with Vondrak's expert, William Gaut, that the first handcuff that McCants applied was fastened to seven clicks, while the second was given six clicks.  See id.  Tipton also agrees with Gaut that the number of clicks made by each handcuff provides important information regarding the tightness of the restraints on Vondrak's wrists.  See id.

With the importance of the number of clicks in mind, Tipton notes in his report that he has conducted numerous tests using six different pairs of Smith and Wesson Mod. 100 chain handcuffs. Tipton notes in his report that the teeth on each set of Smith and Wesson Mod. 100 handcuffs close at slightly different rates, ranging from .61 inches to .48 inches.  See id. at 5.  To carry out his tests for this case, he used a set of Smith and Wesson Mod. 100 handcuffs with a close of .54 inches.  See id.  Tipton took Gaut's measurement of Vondrak's wrist circumference and diameter.  See id.  He then notes in his report that the nationally accepted method for a professional law enforcement officer to determine the proper tightness of a handcuff is to place a finger between the cuff and the subject's wrist.  See id.

Armed with those assumptions, Tipton then conducted tests on live subjects, placing his test handcuffs on the subjects with slightly larger wrist measurements than Vondrak and applying different numbers of clicks.  See id.  Tipton then checked the finger gauge on the handcuffs to check whether the handcuffs on any of his subjects were applied in conformity with the nationally standard for determining proper tightness.  See id.  Based on this set of tests, Tipton opines that the handcuffs were not applied too tightly.  See id.

One other opinion that Tipton offers is that the 2.5 hour period during which Vondrak was handcuffed was not unreasonable.  See id. at 6.  Tipton explains: "I have found in my 20 years of law enforcement experience that this is not an unreasonable amount of time to process an arrestee.

-4-

Although it is not optimal efficiency to take an Officer off the street this long, or leave an arrestee in handcuffs for this amount of time." Id. at 6. According to Tipton, "[i]t is a fact that the system of processing an arrestee can and does take an extended amount of time." Id.

## PROCEDURAL BACKGROUND

This lawsuit is set to go to trial on August 24, 2009. In anticipation of trial, Vondrak filed this motion in limine. Through the motion, Vondrak seeks the exclusion of Tipton's testimony and report on the grounds that Tipton is not qualified and that the report is not based on a reliable methodology. Vondrak also attacks specific aspects of Tipton's opinion.

**1.    Challenge to Tipton's Qualifications.**

Vondrak argues that Tipton is not qualified to offer opinion testimony in this case. Vondrak notes in his motion that Tipton will be forty-three-years old in November 2009. See Motion ¶ 30, at 5. Vondrak also points out that Tipton has testified in only four depositions between the years 2003 and 2006, and that he has testified in federal court only once, approximately five years ago. See id. ¶¶ 32-33, at 5. Vondrak insists that Tipton's experience in firearms and defensive tactics is not relevant to the issues in this case, and that Tipton's other professional experience is not relevant to the issues in the case. See id. ¶¶ 34-35, at 7.

The Defendants ask the Court to deny Vondrak's challenge to Tipton's qualifications. See Defendants' Response to Plaintiff's Combined Motion in Limine and Daubert Motion to Exclude the Report and Testimony of Tim Tipton at 2, filed August 3, 2009 (Doc. 198)("Response"). The Defendants note that Vondrak neglected to include Tipton's resume with his motion. See id. at 3.[1] They also object to the contention that Tipton's age and the number of litigation matters in which

_____

[1] The Defendants provided the Court a copy of Tipton's resume.

he has testified as a witness undermine his qualifications.  See id.  The Defendants argue that Tipton is qualified to testify in this case, because he instructs and develops training courses on the use of force and traffic stops.  See id.

### 2.        Opinions Regarding Reasonable Suspicion and Probable Cause.

Vondrak challenges Tipton's opinions that there was reasonable suspicion to conduct the field-sobriety tests and probable cause to take Vondrak into custody.  See Motion ¶ 1, at 1.  His argument supporting exclusion of this evidence is that the Tenth Circuit already ruled on those issues as a matter of law.  See id. ¶ 2, at 1.  Thus, Vondrak argues, the evidence is inappropriate, because those issues have been removed from the case.  See id.

In their response, the Defendants register their agreement with the first two paragraphs of Vondrak's motion in limine, to the extent that the Tenth Circuit has removed the issues of reasonable suspicion and probable cause from the case.  See Response at 2.  Because the legal questions regarding reasonable suspicion for the field-sobriety tests and probable cause for the arrest have been resolved in their favor, the Defendants do not oppose Vondrak's motion "in this very limited regard."  Id. at 3.

### 3.        Use of Police Tactics to Rear Handcuff Vondrak.

Vondrak objects to the opinion that McCants used well-established police tactics when she requested that Vondrak place his hands behind his back during the field-sobriety tests as a means of getting Vondrak in position to safely apply handcuffs.  See Motion ¶ 3, at 1.  Vondrak urges the Court to exclude testimony on this point, because Tipton did not interview McCants to ascertain her motives for doing what she did.  See id. ¶ 5, at 2.  Vondrak also argues that, at McCants' deposition, the Defendants' counsel produced evidence of a procedure that Las Cruces Police Department officers are supposed to follow when rear handcuffing a compliant subject.  According to Vondrak,

-6-

McCants admitted at her deposition that she did not follow that procedure.  See id. ¶ 6, at 2. Vondrak also insists that Tipton's testimony will not be helpful and that it is the jury's job, and not the expert's, to decide what was reasonable.  See id. ¶ 8, at 2.

The Defendants counter that Vondrak has not cited any legal authority for the proposition that, as a matter of law, a proposed expert must interview a witness informally rather than rely on sworn testimony.  See Response at 4.  The Defendants point out that Vondrak's expert did not conduct similar interviews to form his opinion.  According to the Defendants, Tipton properly relied on his review of McCants' and of Defendant Nathan Krause's deposition testimony to form his opinion.  See Response at 4.

The Defendants also contend that Vondrak's assertion that an expert cannot testify about issues that the jury must ultimately decide – such as reasonableness – is misplaced because experts may give opinion testimony that embraces an ultimate issue to be decided by the trier of fact.  See id. at 5.

**4.    Opinion Regarding Double Locking.**

Vondrak also argues that Tipton has no factual basis for his opinion that the handcuffs on Vondrak's wrists were double locked.  See id. ¶ 11, at 3.  Vondrak further contends that Tipton had no scientific basis for forming his opinion that the handcuffs were double locked.  See id. ¶ 12, at 3.  Vondrak points to Gaut's conclusion that the recording from McCants' belt recorder does not reveal the sound of double locking.  See id. ¶ 15, at 3.

The Defendants respond that Tipton set forth a detailed analysis of how he reached his opinion that the handcuffs were double locked.  See Response at 6.  According to the Defendants, Tipton conducted tests on live subjects to reach his conclusion.  The Defendants therefore urge the Court not to credit Vondrak's challenge.  See id.

5.      **Handcuff Tightness**.

Vondrak objects to Tipton's testimony about the tightness of the handcuffs on several grounds.  First, he asserts that the opinion is speculative, because it is not based on the actual set of handcuffs McCants used on Vondrak.  See Motion ¶ 20, at 4.  Vondrak contends that the live-subject tests that Tipton conducted are scientifically unreliable because, while Vondrak was handcuffed with his hands behind his back, the test subjects were handcuffed with their hands in front.  See id. ¶ 22, at 4.  It is also Vondrak's view that Tipton's tests are unreliable because the finger is supposed to be placed between the handcuff and the outside edge of the writ and the handcuff, while Tipton placed the finger in between the wrist and the middle part of the handcuffs.  See id. ¶¶ 23-24, at 4.

The Defendants, on the other hand, argue that Vondrak's criticism that Tipton did not provide a basis for using Smith and Wesson handcuffs is misplaced because Vondrak is aware, based on the Defendants' discovery responses, that McCants used Smith and Wesson handcuffs.  See Response at 6.  The Defendants also maintain that Vondrak provides no indication that there is a significant variance between models.

In response to Vondrak's insistence that Tipton's methodology is unreliable because he did not handcuff his tests subjects with their hands behind their backs, the Defendants argue that "[c]ommon sense dictates that it would not [make a difference] since the circumference of a person's wrist obviously do [sic] not change depending upon whether that person has his or her wrists in front of or behind her back."  Id.  at 7.  Moreover, the Defendants assert that Tipton's nineteen years of experience in design, development, and implementation of law-enforcement use of force-training programs gives him the ability to testify regarding national standards of law enforcement.  See id.

6.      **Length of Time in Handcuffs**.

Vondrak maintains that Tipton's opinion regarding whether it was reasonable to leave

Vondrak in handcuffs for 2.5 hours is based on speculation.  <u>See</u> Motion ¶ 26, at 5.  According to Vondrak, "[w]hat is or is not a reasonable time period should be determined by a jury under the facts and circumstances of the case."  <u>Id.</u> ¶ 27, at 5.  In Vondrak's view, "[Tipton] is trying to substitute his judgment for that of the jury without any basis or justification."  <u>Id.</u>

To counter Vondrak's contentions on this issue, the Defendants reiterate their position that it is proper for Tipton to rely on McCants' sworn testimony and that he does not need to personally interview her.  <u>See</u> Response at 7.  They also assert that, while reasonableness of the length of time will be a question for the jury, it is proper under the Federal Rules of Evidence for an expert to opine about this ultimate issue.  <u>See</u> Response at 7.

Finally, as an alternative to denying Vondrak's motion, the Defendants ask the Court to conduct a voir dire of Tipton before making a final ruling.  They insist that Vondrak's motion is of such poor quality that a <u>Daubert</u> hearing is not necessary.  Nevertheless, they would like the Court to allow presentation on any <u>Daubert</u> matters before making a ruling if the Court is considering ruling in Vondrak's favor.  <u>See</u> Response at 8.

**7.    <u>The August 11, 2009 Hearing</u>.**

At the August 11, 2009 hearing, Vondrak stated that he had not deposed Tipton, but that the Court could decide the motion without any need to call Tipton for a voir dire.  <u>See</u> Transcript of Hearing at 12:25-13:3 (taken August 11, 2009)(Byrnes)("Tr.").[2]  The Defendants also stated at the hearing that there was no need to bring Tipton in to testify and that the Court could rule on Vondrak's motion on the materials that have been provided.  <u>See id.</u> at 26:3-9-10 (Court & Lutz).

At the hearing, Vondrak characterized Tipton as a "judo expert, trained in gun control" who

---

[2]  The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

employed "junk science" to reach his conclusion regarding the tightness of the handcuffs.  See id. at 14:7-21 (Byrnes & Court). Vondrak also restated his argument that whether Vondrak remained handcuffed for a reasonable period of time is a jury question and not one on which Tipton may opine.  Based on Vondrak's contention in this regard, the Court asked: "Well, is your expert going to say the time was not – was excessive?"  Id. at 16:21-22.  Vondrak responded: "My expert is going to say that there was no reason at all keeping a guy handcuffed behind his back, who's in a jail cell." See id. at 16:23-25 (Byrnes).  In follow up, a dialogue ensued between the Court and Vondrak's counsel:

> THE COURT: Well I guess – tell me – tell me why I should let one testify to the jury and not the other.
>
> MR. BYRNES: Because there's no Daubert motion before you on my client – my witness.  There's only – you're only facing a motion on theirs.  I'm not here to justify my expert.  They didn't file a motion.
>
> THE COURT: Well, but I assume that you think the methodology of your expert's sound, right?
>
> MR. BYRNES: Judge, I'm in here as I said I'm here on my motion to strike his report for the reasons I stated.  You're the gatekeeper, this is junk science.  This is the cover up of things McCants didn't do correctly . . . .

Id. at 17:1-12.

## THE COURT'S GATE-KEEPING ROLE UNDER DAUBERT

Since the Supreme Court of the United States decided Daubert v. Merrell Dow Pharmaceuticals, Inc., trial courts have had the responsibility to ensure that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide. "To fulfill its gatekeeping role, a district court must therefore conduct a two-part inquiry."  Bitler v. A.O. Smith Corp. 391 F.3d 1114, 1120 (10th Cir. 2004).  The first part of this inquiry is to determine "the expert's proffered testimony – whether it concerns scientific, technical, or other

special knowledge – has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" <u>Id.</u> (quoting <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. at 592 (alterations in <u>Bitler v. A.O. Smith Corp.</u>).  The court must not only decide whether the expert is qualified to testify, but whether the opinion testimony is the product of a reliable methodology.  <u>Daubert</u> requires the Court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound.

### 1.    Rule 702.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Thus, rule 702 requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994).  An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."  <u>LifeWise Master Funding v. Telebank</u>, 374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. <u>See</u> <u>Morales v. E.D. Etnyre & Co.</u>, 382 F.Supp.2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987)).

Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . .

. the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). The Court should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

       2.      **The Daubert Standard.**

In its role of gatekeeper, the Court must assess the reasoning and methodology underlying an expert's opinion and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Refining Co., LP, No. CIV 03-1160 BB/LAM, 2005 WL 5988649 at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).  The Supreme Court articulated a non-exclusive list of factors which weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies;

or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Refining Co., LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The United States Court of Appeals for the Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." [Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)](quoting Daubert, 509 U.S. at 589, 113 S.Ct. 2786).  This obligation involves a two-part inquiry.  Id.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  Id. (quoting Daubert, 509 U.S. at 592, 113 S.Ct. 2786).  In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93, 113 S.Ct. 2786).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."  Daubert, 509 U.S. at 597, 113 S.Ct. 2786.

397 F.3d at 883-84 (footnote omitted).  "The second inquiry is related to the first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . .  The evidence must have a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand) and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591)).  If the expert's proffered testimony fails on the first prong, the court does not reach the second prong.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.

In conducting its Daubert review, the court must focus generally on "principles and methodologies, and not on the conclusions generated."  Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665 at *11 (D.N.M.)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595).  "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . .  and the court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered." Armeanu v.

Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665 at * 11 (internal quotation marks and

bracket omitted).  The proponent of the expert's opinion testimony bears the burden of establishing

that the expert is qualified, that the methodology he or she uses to support his or her opinions is

reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.  See

Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  As the Tenth Circuit noted in Hollander v.

Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing
> reliability under Daubert, and because, in light of that discretion, there is not an
> extensive body of appellate case law defining the criteria for assessing scientific
> reliability, we are limited to determining whether the district court's application of the
> Daubert manifests a clear error of judgment or exceeds the bounds of permissible
> choice in the circumstances. . . . Thus, when coupled with this deferential standard
> of review, Daubert's effort to safeguard the reliability of science in the courtroom
> may produce a counter-intuitive effect: different courts relying on the essentially the
> same science may reach different results.

289 F.3d at 1206. As the United States Court of Appeals for the Ninth Circuit noted in Claar v.

Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the
> antithesis of this method. Certainly, scientists may form initial tentative hypotheses.
> However, scientists whose conviction about the ultimate conclusion of their research
> is so firm that they are willing to aver under oath that it is correct prior to performing
> the necessary validating tests could properly be viewed by the district court as
> lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion
> to determine whether expert testimony will be helpful to the trier of fact. In making
> that determination, the court should consider, among other factors, the testimony's
> relevance, the jurors' common knowledge and experience, and whether the expert's
> testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Environment, No. CIV 05-1083 JB/WPL, 2006 WL 4079623 at * 10 (citing

United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

## EXPERT TESTIMONY ON ULTIMATE ISSUES

Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact. "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury." 1 K. Broun, McCormick On Evidence § 12 (6th ed. 2006 update). The Federal Rules of Evidence reflect that the ultimate issue rule has been abolished. See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998). Under rule 704: "(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). The exception given in rule 704(b) states that an expert testifying regarding the mental state or condition of a defendant in a criminal case may not state an opinion or inference whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense to the crime. See Fed. R. Evid. 704(b).

Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some limitations, aside from those expressed in rule 704(b), regarding testimony on ultimate issues. The Tenth Circuit has stated: "[A]n expert may not state legal conclusions drawn by applying the law to the facts." A.E. By and Through Evans v. Independent School Dist. No. 25, of Adair County, Okl., 36 F.2d 472, 476 (10th Cir. 1991).

## LAW REGARDING THE USE OF POLICE STANDARD OPERATING PROCEDURES

In some cases where individuals sue law enforcement officers for civil rights violations, those individuals will seek to introduce into evidence police department Standard Operating Procedures ("SOPs") as a means of demonstrating that police conduct was unreasonable. In one case, a plaintiff tried to introduce an SOP from the Albuquerque Police Department that stated:

"[W]here force is warranted, officers should assess the incident in order to determine which technique or weapon will reasonably de-escalate the incident and bring it under control safely. Officers shall use only that force which is reasonable and necessary to effect lawful objectives." Tanberg v. Sholtis, 401 F.3d 1151, 1162 (10th Cir. 2005)(internal quotation marks and citations omitted).  The plaintiffs in  Tanberg v. Sholtis hoped to introduce the SOP along with expert testimony regarding whether a defendant police officer's conduct conformed with the SOP.  See id.

The Tenth Circuit affirmed the trial court's decision to exclude the SOP, noting: "To the extent that the first half of the SOP requires an assessment of an officer's choice between various techniques for de-escalation, it is beyond the scope of the inquiry mandated by state and federal law, which require that an officer use reasonable, not optimal, force."  Id.  The Tenth Circuit then discussed the second half of the SOP, explaining that it

> merely duplicates the reasonableness standard that governs claims of excessive force under state and federal law. Federal excessive force claims are governed by an objective standard: a use of force violates the Fourth Amendment if it is unreasonable under the circumstances a law enforcement officer confronts.  New Mexico law permits an officer to use such force as [is] reasonably necessary under all the circumstances to effect an arrest. That the SOP duplicates the federal and state standards for excessive force makes it less likely that evidence of the SOPs would be relevant.  Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The jury was already obliged to determine whether Officer Sholtis's conduct violated the requirement of state and federal law that he use only a reasonable degree of force in effecting Plaintiffs' arrest. That the SOP required precisely what the law required of him does not make it more or less likely that Officer Sholtis's use of force was reasonable; the SOP is therefore not relevant.

Tanberg v. Sholtis, 401 F.3d at 1163 (internal quotation marks and citations omitted).

The Tenth Circuit in Tanberg v. Sholtis also found that, beyond the general concerns with relevance, there were more particular reasons to find the SOP irrelevant to the plaintiff's federal claims:

-16-

>  In the exclusionary rule context, the Supreme Court has rejected the use of local
>  police regulations as a standard for evaluating constitutionality of police conduct, on
>  the ground that such a "basis of invalidation would not apply in jurisdictions that had
>  a different practice." <u>Whren v. United States</u>, 517 U.S. 806, 815 . . . (1996). That
>  logic would seem to apply equally to damage suits under § 1983. This Court has
>  consistently held that the violation of police regulations is insufficient to ground a
>  § 1983 action for excessive force.

<u>Tanberg v. Sholtis</u>, 401 F.3d at 1163.  Accordingly, the Tenth Circuit stated: "That an arrest violated

police department procedures does not make it more or less likely that the arrest implicates the

Fourth Amendment, and evidence of the violation is therefore irrelevant." <u>Id.</u> at 1163-64.

Similarly, in another case, a plaintiff attempted to have her expert testify at trial based on a

theory that police officers should always use the minimum amount of force, and that any amount

beyond the minimum would be, ipso facto, unreasonable.  <u>See Marquez v. City of Albuquerque</u>, 399

F.3d 1216, 1221-22 (10th Cir. 2005).  The expert was also going to testify that the defendant

officer's conduct "violated well established law enforcement standards." <u>Id.</u> (internal quotation

marks omitted).  The district court in <u>Marquez v. City of Albuquerque</u> excluded the expert's

testimony on both issues as irrelevant and confusing under rules 402 and 403.  <u>See Marquez v. City</u>

<u>of Albuquerque</u>, 399 F.3d at 1222.  The Tenth Circuit found that the district court did not abuse its

discretion, noting:

>  Here, the district court held the testimony regarding the minimum use of force was
>  irrelevant on the ground that the Fourth Amendment does not require police officers
>  to use the least intrusive amount of force. Similarly, the district court held the
>  testimony regarding law enforcement standards was both irrelevant and confusing
>  on the ground that the violation of such standards is not *ipso facto* a Fourth
>  Amendment violation. As both of these grounds are supported by well established
>  precedent, it was not an abuse of discretion to exclude Kirkham's testimony.

<u>Marquez v. City of Albuquerque</u>, 399 F.3d at 1222 (emphasis in original).

## <u>ANALYSIS</u>

Vondrak challenges both Tipton's qualifications to testify in this case and his methodology.

Taking both challenges in turn, the Court finds that Tipton is adequately qualified, as someone with several years of experience in training law-enforcement officers in the use of defensive and force tactics, to offer opinions as part of the defense to Vondrak's excessive-force claim.  After examining Tipton's methodology, the Court also finds that much of his proposed testimony is admissible.  The Court will exclude only one aspect of the testimony for methodological defects: Tipton does not offer a reliable basis for his testimony that McCants double locked the handcuffs that she placed on Vondrak.  The Court will therefore exclude testimony on that issue.  The Court will also not permit Tipton to testify with reference to national standards because the Tenth Circuit has ruled that such testimony is not relevant to the Fourth-Amendment inquiry of excessive-force claims.  Finally, the Court will not permit Tipton to cast his opinion testimony in terms of whether McCants acted reasonably.  He can testify that the handcuffs were not too tight, and he can express opinion that the period of time during which Vondrak was in handcuffs was not too long, but he must refrain from directly referencing the legal standard of reasonableness.

**I.     THE COURT ACCEPTS THE DEFENDANTS' STIPULATION THAT TIPTON'S TESTIMONY REGARDING REASONABLE SUSPICION AND PROBABLE CAUSE IS NOT RELEVANT.**

Vondrak objects to the introduction of Tipton's proposed testimony that McCants acted with reasonable suspicion when she subjected Vondrak to field-sobriety tests and that she had probable cause to take him into custody after she perceived that he failed those tests.  In support of his objection, Vondrak points out that the Tenth Circuit has already decided, as a matter of law, that McCants had reasonable suspicion and probable cause.  The Defendants do not dispute this point.  Given that the Tenth Circuit has ruled on the issues of reasonable suspicion and probable cause, those issues are not longer part of the case.  Testimony about them is therefore not relevant.  Accordingly, the Court agrees with the parties that Tipton should not be allowed to testify whether

there was reasonable suspicion to conduct the tests and probable cause to arrest Vondrak.

## II.    TIPTON IS QUALIFIED TO OFFER HIS OPINIONS.

Vondrak asserts that Tipton is not qualified to testify in this case.  An examination of Tipton's education, training, and experience, however, convinces the Court that Vondrak's contention in this regard is misplaced.  Tipton is qualified to testify, and the Court will not exclude his opinion testimony on qualification grounds.

Rule 702 sets forth what the Tenth Circuit has described as a "liberal standard" regarding expert qualification.  United States v. Gomez, 67 F.3d 1515, 1526 (1995).  Rule 702 allows "a witness qualified as an expert by knowledge, skill, experience, training, or education" to offer opinion testimony.  While the district courts possess the power to decide preliminary questions regarding expert qualifications, "[n]either Rule 702 nor any other rule or precedent . . . sets forth a specific method by which the trial judge must determine the qualification of an expert."

Tipton's qualifications are adequate, and his experience is germane to the questions the jury must decide in this case.  Tipton's resume states that his education includes "Advanced Law Enforcement Certification."  Expert Witness Report at 10.  Since 1998, he has taught as an adjunct professor at Oklahoma State University, Oklahoma City.  He is currently a lieutenant with the Oklahoma Highway Patrol with nineteen years of experience in the design, development, and implementation of law-enforcement use-of-force programs.  See id.  He has experience as a classroom instructor as well as in the capacity of a scenario-based instructor, and courses he has developed are currently in use in various state, federal, and foreign law enforcement agencies.  See id.

Moreover, as a trooper, Tipton has spent time as a "Lead Firearms and Defensive Tactics Instructor," where his duties involved developing lesson plans and student manuals for use-of-force

-19-

tactics.  Id.  He also developed department policies concerning use-of-force.  See id.  Tipton additionally has experience as a "Firearms and Defensive Tactics Instructor" and as a "Department of Homeland Security certified instruction."  Id. at 10-11.  Finally, he is certified as a "Police Use of Force Expert."  Id.

The live questions in this case revolve around whether police officers used excessive force by applying handcuffs too tight and by allowing Vondrak to remain handcuffed for longer than necessary.  An individual who has taught courses in use-of-force tactics to numerous law-enforcement agencies over the years, who has many years of experience as a trooper who has presumably had to apply force, and who is certified as a "Police Use of Force Expert" has sufficient experience, education, and knowledge to opine in an excessive-force claim.  In short, an individual with years of training and expertise, and who has trained others, in police use-of-force is adequately qualified to testify about the use of force in this case.

Vondrak has attempted to minimize and has omitted reference to, much of Tipton's most pertinent experience.  At the hearing, for example, Vondrak's counsel characterized Tipton as a judo and firearms expert in a manner suggesting that these two fields encompassed the universe of Tipton's background and training.  Similarly, in his Motion, Vondrak declined to attach a copy of Tipton's resume and ignored the elements of Tipton's resume that had an obvious connection to generalized "use-of-force" tactics.  Vondrak's approach to attacking Tipton's qualifications is therefore unpersuasive and unavailing.

### III.    THE COURT WILL ALLOW TIPTON TO TESTIFY ABOUT SOME, BUT NOT ALL, OF THE MATTERS ON WHICH HE PROPOSES TO OFFER OPINION.

Although the Court finds that Tipton is qualified to testify about the excessive-force issues in this case, the Court will admit only some parts of his proposed testimony.  The testimony

regarding use of force and the tension of the handcuffs is supported by a sufficiently sound methodology, and is relevant to the issues in this case.   That testimony is therefore admissible.  The Court also believes Tipton may testify, based on his twenty-years of experience as a law enforcement officer, that 2.5 hours was not an excessive period of detention.   No methodology, however, supports some of Tipton's proposed testimony.   Namely, Tipton does not provide a sound reason for concluding that the handcuffs were double locked.   Additionally, because the Tenth Circuit has foreclosed expert testimony that refers to SOPs or other established law-enforcement standards, the Court will preclude reference to national law-enforcement standards.

### A.   SOME OF TIPTON'S OPINION TESTIMONY DOES NOT SURVIVE A <u>DAUBERT</u> CHALLENGE.

Under <u>Daubert v. Merrell Dow Pharm., Inc.</u>, the Court must probe the methodology underlying Tipton's proposed opinions to determine the opinions' admissibility.  The Supreme Court has set forth a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.  <u>See</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 594-95.  The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  <u>Witherspoon v. Navajo Refining Co., LP</u>, 2005 WL 5988649 at *3 (citing <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997)).

1.    **Tipton's Methodology for Testing the Tightness of Handcuffs is Sufficiently Reliable to Support his Conclusion that McCants Applied the Handcuffs to Vondrak in a Reasonable Manner.**

There are certain parts of Tipton's testimony that survive the Daubert inquiry.  Tipton opines that McCants used a reasonable amount of force when she handcuffed Vondrak, and that, based on the evidence, the handcuffs were set to the proper tension.  See Expert Report at 7.  To establish his conclusion, Tipton relied on certain aspects of the report that Vondrak's expert prepared, including an audio analysis of the recording from McCants' belt recorder, measurements of Vondrak's wrists, and certain assumptions about the significance of the number of clicks on a pair of handcuffs.  With those aspects of Gaut's report in hand, Tipton listened to the audio and counted the clicks.  He expresses his agreement that the clicks being heard on the audio are from handcuffs, and he counts the clicks as seven for one set and six for the second.

Tipton then used a pair of Smith and Wesson handcuffs, probably because of the Defendants' acknowledgment that McCants used Smith and Wesson handcuffs on Vondrak, to conduct a series of tests on live subjects.  The handcuffs Tipton chose reflected about an average close rate for the model of handcuffs he was using.  He notes in his report that some handcuffs of the same model have slightly smaller close rates, while other have slightly larger.  See Expert Report at 5.

Tipton placed his selected handcuffs on the wrists of three live subjects who had wrist measurements slightly larger than Vondrak's.  See id. at 6.  One of the subjects, a sixty-two-year-old male, sat with handcuffs on behind his back for 2.5 hours.  Tipton provides photographs showing that there was enough space to fit a finger between the handcuffs and the wrist at ten clicks, though the 2.5-hour test was conducted at seven clicks on the right hand and six clicks on the left – presumably to emulate the circumstances under which Vondrak was placed.  After the test, the subject showed no visible injuries and complained only of shoulder soreness.

Tipton handcuffed the other subjects, and measured the clicks with reference to the diameter and circumference of their wrists.  On both subjects, whose wrists were larger than Vondrak's, after seven clicks, Tipton could place a finger between the handcuff and the wrist – the so-called "finger gauge."  Tipton opines that, because he could the accomplish finger gauge on his test subjects under similar, and at times, more extreme tightening of a similar pair of handcuffs to the ones McCants would have used, McCants did not overly tighten the handcuffs on Vondrak's wrists.  Rather, he believes she applied force in a reasonably prudent manner.

The manner in which Tipton conducted his test alleviates many of the concerns that Daubert raises.  While his experiment is not published in a peer-reviewed journal, he sets forth a simple, reasonable experiment in which he sets forth all of his primary assumptions.  The experiment is easily replicable, and it is based on accepted standards.  Namely, he uses wrist circumference and diameter, measured in inches, and uses a pair of handcuffs with a close rate that closely reflects the handcuffs that McCants probably used.  Thus, to the extent that there is an error rate, that rate would be reflected in the slight variance in handcuff closure rates.  This error rate is not great, and Tipton appears to have controlled for it by choosing a pair of test handcuffs between the smallest and largest closure rates that he ascertained from the six pairs of Smith and Wesson handcuffs that he tested.

Furthermore, it is difficult to see why Tipton's methodology in conducting his test would not be generally accepted in the relevant scientific community.  Tipton established a range of rates of closure for Smith and Wesson handcuffs by taking a sample, and listing the rates for each member of the sample.  Based on those measurements, he established a range.  There is nothing remarkable about this method that would make it difficult to accept.  It may be that the sample size was small.  Perhaps tests on one hundred or on one thousand pairs of handcuffs would reveal a larger variance

in closure rates.  That Tipton used the same model of handcuffs, which are likely produced in as consistent a manner as practicable, minimizes such a possibility.  In any case, such a criticism can be brought out in cross examination and does not render the methodology so unreliable that it should not be admitted.

Tipton also appears to have taken careful measurements of his test subjects' wrists and to have checked for finger gauge on each test based on the number of clicks in the handcuffs.  Taking basic measurements and comparing those measurements to the evidence he observed from the audio analysis shows that Tipton was not relying on unfounded extrapolations.  He had a valid reason for many of his assumptions.  First, he heard the audio that suggested the number of clicks he should apply to his test subject.  Second, he took pains to choose a pair of test-handcuffs that would mimic, as closely as possible, the circumstances of Vondrak's arrest.  Third, he applied the same method of measuring each individuals' wrists, and the space between the wrists and the handcuffs.  While there are some assumptions for which he did not perfectly control – such as the variance in fingers between his finger and that of another individual – such issues are more appropriate for cross examination and do not call for exclusion of the evidence.

In short, Tipton's test, while simple and straightforward, satisfies most of the factors under Daubert, and, as a general matter, constitutes an experiment that would be helpful to the jury because it is based on a valid, even if not perfect, methodology.  The Court will therefore admit the testimony, based on the experiments, that the handcuffs were not too tight and that McCants applied them properly.

> **2.    Tipton Does Not Supply a Valid Methodology to Support His Opinion that the Handcuffs on Vondrak's Wrists were Double Locked.**

In his report, Tipton expresses the opinion that McCants double locked the handcuffs on

Vondrak's wrists.  He rests this conclusion on two premises: (i) that double locking is a nationally recognized procedure; and (ii) that there is no evidence to dispute the double locking.  McCants offers no other reason for his conclusion regarding double locking.  The two reasons he offers are inadequate.

Whether the handcuffs were double locked is something about which an expert might be able to opine if he had a scientific basis for doing so.  For example, an expert could listen to the audio, and present a scientifically acceptable and reliable basis for an assertion that the handcuffs were double locked.  But Tipton offers no such methodology.  Or, he could have testified about the mechanics of handcuffs.  Rather than use a methodology for testing his conclusion, he instead speculates that McCants would have followed the nationally recognized procedure and therefore is likely to have double locked the handcuffs.  That analysis puts the cart before the horse. Furthermore, it is not a valid approach to simply shift the burden of persuasion by stating that he saw no evidence to refute double locking.  Expert testimony must be based on more to be helpful to the jury to be admissible.  The Court will therefore not allow Tipton to present his conclusion that the handcuffs were double locked to the jury.

### 3.    Tipton May Not Offer Testimony Regarding Well-established or Nationally-recognized Procedures.

In various parts of his report, Tipton makes reference to nationally-recognized procedures and well-established police procedures.  He refers to such procedures to demonstrate that McCants acted in conformity with this procedures and that what she did was therefore reasonable.  In light of Tenth Circuit precedent, the Court will reject the contention.

Regarding SOPs, the Tenth Circuit has stated: "That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment,

and evidence of the violation is therefore irrelevant." Tanberg v. Sholtis, 401 F.3d at 1163-64.

Similarly, in another case, a plaintiff attempted to have her expert testify at trial based on a theory

that police officers should always use the minimum amount of force, and that any amount beyond

the minimum would be, ipso facto, unreasonable. See Marquez v. City of Albuquerque, 399 F.3d

1216, 1221-22 (10th Cir. 2005). The expert was also going to testify that the defendant officer's

conduct "violated well established law enforcement standards." Id. (internal quotation marks

omitted).

The district court in Marquez v. City of Albuquerque excluded the expert's testimony on

both points as irrelevant and confusing under rules 402 and 403. See Marquez v. City of

Albuquerque, 399 F.3d at 1222. The Tenth Circuit found that the district court did not abuse its

discretion, noting:

> Here, the district court held the testimony regarding the minimum use of force was
> irrelevant on the ground that the Fourth Amendment does not require police officers
> to use the least intrusive amount of force. Similarly, the district court held the
> testimony regarding law enforcement standards was both irrelevant and confusing
> on the ground that the violation of such standards is not *ipso facto* a Fourth
> Amendment violation. As both of these grounds are supported by well established
> precedent, it was not an abuse of discretion to exclude Kirkham's testimony.

Marquez v. City of Albuquerque, 399 F.3d at 1222 (emphasis in original). The import of Marquez

v. City of Albuquerque and Tanberg v. Sholtis is that the Tenth Circuit does not believe SOPs or

established practices are relevant to the reasonableness inquiry of the Fourth Amendment.

Moreover, the Tenth Circuit believes that such evidence confuses rather than helps the jury.

The Court considered whether it should make a distinction between nationally recognized

standards and a department's SOPs as "well-established" law enforcement standards. After

carefully considering Tanberg v. Sholtis and Marquez v. City of Albuquerque, the Court declines

to make such a distinction. The Tenth Circuit appears not to believe that these standards, whether

they are third-party standards, or internal standards, inform the jury's decision on the question of whether an officer acted reasonably.

The Court can imagine many sound arguments to support the proposition that accepted practices, or well-established practices, if not SOPs, should be considered at least relevant to an inquiry into what a reasonable officer would do. In fact, the Court wonders how the proposition that "violation of such standards is not *ipso facto* a Fourth Amendment violation" renders any reference to such standards in a reasonable-officer inquiry totally irrelevant. The most the proposition appears to establish is that an officer may fall below well established practices without violating the Constitution. Presumably, officers are trained and have developed established practices as a means of preventing improper conduct, including conduct that might result in excessive force, illegal searches and seizures, or other civil-rights violations. Because established practices are, perhaps, more protective of arrestee's rights arguably does not mean they are irrelevant to a Fourth Amendment inquiry. Even so, the Court does not believe it has the liberty to allow such testimony in light of Tenth Circuit law. The Court will accordingly prohibit any testimony that is framed up in reference to "national" or "well-established" practices.

### 4.     Tipton May Testify That McCants Acted Properly in Rear Handcuffing Vondrak and That the 2.5 Hour Detention Was Not Too Long.

Tipton expresses in his report that McCants used a well-established police tactic when she instructed Vondrak to place his hands behind his back during the field-sobriety tests so that she could rear handcuff him. Tipton states that this technique is based on the reality that the time of an arrest that is most dangerous is when a suspect realizes he is being taken into custody and on the understanding that most assaults on officer occur during this phase of detention. This testimony is largely admissible. It is not based on scientific tests or knowledge, but rather on experience and

training in proper use-of-force tactics.  The Court therefore believes it is proper for Tipton to discuss whether McCants acted properly, in light of officer-safety concerns, in rear-handcuffing Vondrak during the field-sobriety test.  Tipton may not, however, testify that the technique was a well-established police practice, given the Tenth Circuit precedent that such testimony is irrelevant.  Furthermore, Tipton may not say that McCants acted reasonably, because such testimony involves the application of a legal standard to the facts.  "[A]n expert may not state legal conclusions drawn by applying the law to the facts." A.E. By and Through Evans v. Independent School Dist. No. 25, of Adair County, Okl., 36 F.2d at 476.

Similarly, Tipton may testify, based on his experience and training, that 2.5 hours was not an excessively lengthy period of time to detain an individual, given the amount of the time that it takes to process an individual.  Again, the testimony is not based on scientific testing, but on the expert's experience and understanding of how much time it takes to process a suspect post-arrest.  Cross-examination will suffice to draw out the flaws that Tipton's conclusions might have.

Vondrak argues that conclusions about the reasonableness of McCants' actions and of the 2.5 hour time period which Tipton expresses in his report are the province of the jury, not the expert, and that the Court should therefore preclude Tipton from offering opinions on those matters.  This criticism is well founded.  The Federal Rules of Evidence establish that the ultimate-issue rule has been abolished.  See United States v. Smith, 156 F.3d at 1054.  Pursuant rule 704: "(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704 (a).  Rule 704 continues to bar expert testimony on the ultimate issue of a criminal defendant's state of mind, but otherwise, there is no bar, if evidence otherwise satisfies the Federal Rules of Evidence, to admitting expert testimony on so-called ultimate issues.  Nevertheless, while

the ultimate evidence rule has been abolished outside of the context of rule 704(b), experts still are not allowed to express opinions involving the application of legal standards to facts. <u>Okland Oil Co. v. Conoco Inc.</u>, 144 F.3d 1308, 1328 (10th Cir. 1998)("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts."). Tipton therefore may not express an opinion that the length of time that Vondrak spent in handcuffs was reasonable.

To summarize, the court Concludes that Tipton has the appropriate qualifications to testify in this case, given his experience, education, and years of experience as a law-enforcement officer and as a someone who offers training on use-of-force tactics. Tipton's methodology supports his conclusion regarding the tightness of the handcuffs to a sufficient degree to allow opinions on those matters to be admitted at trial. Tipton may also testify whether McCants acted properly, in light of officer-safety concerns, in rear-handcuffing Vondrak during the field-sobriety test, as long as he does not make reference to well-established or national standards, and as long as he does not frame his opinion in terms of whether McCants acted reasonably. Tipton may also testify, based on his twenty years of experience, that 2.5 hours was not an excessive time period to keep Vondrak handcuffed. Tipton may not, however, offer his opinion that the handcuffs were double locked. Nor may he offer testimony that refers to national standards or well-established police practices. Finally, Tipton may not testify regarding the existence of reasonable suspicion and probable cause because those issues are no longer a part of the case.

**IT IS ORDERED** that Plaintiff's Combined Motion in Limine and Daubert Motion to Exclude the Report and the Testimony of Tim Tipton is granted in part and denied in part, consistent with the Court's analysis here.

-29-

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Barry J. Byrnes
Las Cruces, New Mexico

      *Attorney for the Plaintiff*

Harry S. Connelly, Jr.
  Deputy City Attorney for the
   City of Las Cruces
Las Cruces, New Mexico

-- and --

William L. Lutz
David P. Lutz
Martin, Lutz, Roggow, Hosford & Eubanks, P.C.
Las Cruces, New Mexico

      *Attorneys for Defendants City of Las Cruces, Cindy McCants,*
        *and Nathan Krause*